In the Matter of **STANDARD BRASS CORPORATION**, Philip B. Johnson, Trustee, Applicant-Appellee,

v.

The **FARMERS NATIONAL BANK OF BELVIDERE**, Respondent-Appellant.

**No. 16118.**

United States Court of Appeals
Seventh Circuit.

Dec. 21, 1967.

Frank O. Wetmore, II, Chicago, Ill., Edward J. Enichen, Rockford, Ill., for respondent-appellant.

Kenneth Ritz, Rockford, Ill., for applicant-appellee.

Before HASTINGS, Chief Judge, KNOCH, Senior Circuit Judge and CASTLE, Circuit Judge.

KNOCH, Senior Circuit Judge.

The Bankrupt, Standard Brass Corporation, filed its bankruptcy petition July 9, 1965. Philip B. Johnson was appointed Receiver, and, subsequently, elected Trustee by the general creditors on August 30, 1965, after which he adopted his own acts as Receiver.

When the bid on the plant of the Bankrupt, realty and personalty as a whole, was exceeded by bids on the personal

property and realty separately, these were sold as separate items. The personal property was sold to Samuel J. Winternitz for $145,000 and the realty to the respondent-appellant. The Farmers National Bank of Belvidere (hereinafter sometimes called "the Bank") for $72,500.

Several creditors claimed ownership or security interests in the personalty. There was a federal tax lien for $11,133 on file. The realty was encumbered by a Trust Deed dated April 2, 1965, securing a note for an original principal sum of $72,000 (reduced to $71,021.90 by payment) held by the Bank.

The Bank announced that it would set off its secured claim against the bid. Both sales were confirmed the same day they were made: August 30, 1965. On receiving the earlier notice of the Receiver's application to marshal liens and sell the entire property free and clear of liens, the Bank had filed objections to the sale of the real estate, but at the hearing on the application, August 30, 1965, which was held at the same time as the first meeting of creditors, the Bank's objections were overruled, and the realty offered forthwith for sale the same day at public auction before the Referee. The Bank was the successful bidder.

On September 14, 1965, the Trustee filed an application to apportion expenses. On October 25, 1965, the Referee authorized the Trustee to disburse as expenses of administration, the total sum of $6,152.90 for Receiver's fees, unpaid liabilities and attorney's fees.

Another problem arose in connection with the sale of the realty. On March 15, 1966, the Trustee moved to amend the order of August 30, 1965, confirming the sale of realty to correct the legal description of the real estate purchased by the Bank to include a specific description of the parcel comprising the adjacent Boone Street area which was allegedly vacated by ordinance, on agreement of the parties that the Receiver intended to sell and the Bank intended to buy all of the Bankrupt's real estate.

The order of August 30, 1965, was so amended nunc pro tunc on March 17, 1966.

The Referee decided that it would be proper to apportion against the lien creditor Bank a reasonable share of the expenses attributable to the sale which he thought should bear some relationship to the approximate cost of foreclosure and sale which he estimated would have been about $4,433. However, he considered not just the sale of the realty but the sale of the entire plant including both realty and personalty. The total sale price had been $217,500 of which the realty brought $72,500 or one-third. In computing expenses he made no allowance for Trustee's fees as those would come from the assets of the estate, but he found chargeable expenses of the Receiver in the amount of $1,093.61 and allocated one-third of these to the realty. He also allocated an amount to be due the United States for the Referees Salary and Expense Fund (computed on the sale price of the realty) at $1,700. He allocated one-third of the Receiver's fees (allowed in the sum of $1,900) or $633.33.

He computed the allocable part of the fees to the Receiver's attorney as follows: the amount of the total fee for services up to August 30, 1965, the date of the sale, allocable to services connected with the sale, he found to be $2,100 of which one-third was $700. In estimating services during the protracted controversy after the sale, he gave consideration to testimony of an attorney for the Bank that the charges made to the Bank for legal services were in excess of $2,750 for 87½ hours including services in connection with other matters than opposing the applications and motions of the Receiver-Trustee. The Referee deducted $1,000 and allocated $1,750 making a total of $2,450 as fees for the Receiver's attorney which he charged to the real estate. That made a total of $5,147.87.

It was the Referee's judgment that $4,750 would be a fair and reasonable share of the expense to apportion against the Bank and he accordingly entered an

order directing the Bank to pay the Trustee $4,750. We hold that the entry of that order was improper in the circumstances here.

With respect to the land conveyed, however, the Referee felt that the evidence thus far adduced was inadequate to decide the ownership of the added parcel, Boone Street. If any of the lands dedicated to street purposes in the original platting in 1856 had been lawfully vacated, then title would have passed to the abutting land owners, each taking to the center line of the street. The Referee saw complications arising from the fact that a corner of the factory building rested on land to which he thought Standard Brass had no valid claim of ownership even if there were a valid vacation ordinance.

There was testimony by the Bank's president that the City of Belvidere had adopted a vacating ordinance several years before but that this was missing and could not be found when title had been brought down to date after the Receiver's sale. However, another vacating ordinance was subsequently adopted. The Trust Deed executed within four months of the bankruptcy (although no question of preference was raised) did not specifically describe the Boone Street area. The referee was also concerned about federal tax liens and claims some of which, he stated, were of record prior to the bankruptcy. He felt that there were uncertainties as to whether other creditors might have some claim on the Boone Street area, assuming that the Bankrupt had owned it, and he, therefore, reopened the case for further hearing after notice to all unsatisfied lien claimants to determine the ownership and title to the property involved and the amount, validity and priority of the liens claimed.

The Referee's findings of fact and conclusions of law were affirmed by the District Court and this appeal followed.

The Bank notes that most of the Receiver's activity in preparing for the sale related to the personal property. There was no public advertisement. He wrote to some twelve individuals and firms who might be interested in the equipment, etc. The Clerk of the Court sent notices to about twenty-four prospects including those to whom the Receiver had written, in addition to the scheduled creditors. Two expressed interest in the realty. Only one of those followed it up. There were only two bids besides the Bank's for the real estate. The Receiver had no out-of-pocket expense in preparing to sell the real estate.

At the time of the hearing on the application to apportion costs, the Trustee had cash on hand of $57,378 after paying a secured claim of Commercial Discount Corporation in the amount of $77,500 and a federal tax lien of $11,133.

The realty had been appraised at $76,000. The Bank's note and Trust Deed showing an unpaid principal balance of $71,201.90 provided for costs and fees of foreclosure to be additional secured amounts. The Bank had objected firmly to marshalling of liens and sale of the property free and clear of liens. All this was known to the Referee who must have realized that there would be little likelihood of any real benefit to the general creditors by such sale of the real estate.

The Trustee argues that a sale free of lien can be expected to yield greater proceeds for the general creditors and was therefore justified here. The Bank, however, contends with reason that no real effort was made to promote competitive bidding. Only five days' notice was given and then only to a very limited number of persons. Immediately after the order of sale was orally entered, the Receiver sold the real estate free of liens without previous advertisement or public notice, on the same day as the first meeting of creditors, when the Receiver's term was about to expire and a Trustee was about to be appointed.

The surplus achieved to which the Trustee refers in his argument arose only from the sale of the personal property. Yet, although no benefit for the general creditors was secured from this hasty sale of the realty, the sale was promptly confirmed while the Receiver

was still in office. The bidding showed that only the Bank was willing to pay a sum approaching the appraised value. The Bank contends that it was forced to bid on the real estate to protect its lien and that no benefit has accrued to the Bank which has been subjected to delays and expenses of litigation, and has still not received a conveyance of the real estate pursuant to the Referee's order of August 30, 1965. It cannot be assumed that the Bank would surely have proceeded to foreclosure with its attendant expense, which, in any case, would have been included as an additional secured amount under its Trust Deed.

The valuation of the Bank's collateral and the amount of its remaining unsecured claim did not require an actual sale of the real estate. There are no objections of the Trustee to the Bank's secured claim of $73,604.95, although the Trustee now argues that there might have been some question at the time of the sale because of a possible preference and the subsequently ascertained discrepancy in the legal description which did not specifically describe the Boone Street area.

■ To take jurisdiction of the encumbered property in which there was obviously no equity for the bankrupt estate and to sell it free of lien over the objections of the lienor with the result only of subjecting it to costs of administration was an abuse of discretion. In Re Miller, 7 Cir., 1938, 95 F.2d 441, 442; Seaboard Nat. Bank v. Rogers Milk Products, 2 Cir., 1927, 21 F.2d 414, 416–417. We find no unusual reason here to justify the action taken.

The Trustee mistakenly relies on this Court's decision in In Re Utt, 7 Cir., 1901, 105 F. 754, 757, where this Court said it was equitable and right that the expenses of sale, including advertisement, appraisement, if required by law, revenue stamps and compensation to the Trustee be paid out of proceeds of the sale.

■ In Utt, there was a consenting secured creditor. We cannot agree with the Trustee that consent was an irrelevant circumstance. See In Re Vulcan Foundry & Machine Co., 3 Cir., 1910, 180 F. 671. After the sale of the real estate and the personal property here, there remained an equity of $56,367 over the amount of the liens marshalled against the sale proceeds. This should be applied before impairing the rights of secured creditors. Further, Utt distinguished between expenses directly attributable to the sale and general costs of administration (which were not to be charged against even a consenting creditor) and took occasion to criticize a sale where no recovery for general creditors appeared likely and the sole visible purpose was to create claims for costs to be paid by displacement of vested rights.

The net result of the sale of the real estate here was a surrender of the real property against a portion of the Bank's lien. There were adequate funds on hand to pay the costs and expenses (which would apparently have been the same had the real estate not been sold) without recourse to the "proceeds" of the real estate. See In Re Street, 3 Cir., 1950, 184 F.2d 710; Textile Banking Co. v. Widener, 4 Cir., 1959, 265 F.2d 446; Lucas v. Sherry, 5 Cir., 1922, 284 F. 965.

Reconstruction Finance Corp. v. Rhodes, 5 Cir., 1954, 214 F.2d 606, and Annotation 48 A.L.R.2d 1343, 1363 (1956), to which the Trustee refers, deal with charging a lien creditor with some measure of the expense directly attributable to the sale itself and not to general costs of administration such as the Referee Salary and Expense Fund and the fees of the Receiver and his attorney.

■ No attempt has been made to charge the Internal Revenue Service with any costs or expenses. Nor can we agree that a clear inference of payment of any costs can be drawn from the stipulation with Commercial Discount Corporation that its claim of $81,366 be reduced to $77,500 and allowed as a secured claim against the proceeds of the personal property provided its sale produced sufficient to pay that sum.

**90**

■ On March 17, 1966, an order was entered nunc pro tunc August 30, 1965, correcting the legal description in the order of August 30, 1965, which confirmed the sale of the realty to the Bank. No petition for review of the Referee's order of August 30, 1965, or as corrected March 17, 1966, was filed within the 10-day period provided by 11 U.S.C.A. § 67c, no extension thereof having been requested. The order thus became final. The Bank has already changed its position in reliance on the order, having contracted to sell the realty to a third party.

The Trustee asserts that there is no question of reviewing a final order confirming a sale, but only of determining the validity and amount of the claimed lien of the Bank to ascertain how much of it must be allowed as an unsecured claim, as the legal description set out in the original uncorrected order of August 30, 1965, is the same legal description as that of the Bank's Trust Deed. The Trustee argues that the Bank's secured claim to payment out of the proceeds of the sale in advance of unsecured creditors cannot exceed the value of its Trust Deed.

However, as the Bank points out, the Bank had a secured claim of $73,604.95. The Trust Deed described the land precisely as set out in the Bankrupt's schedules, the Receiver's inventory and the application for sale.

On January 10, 1966, the Bank filed an intervening petition to settle its claim. A hearing was held February 21, 1966, at which witnesses were heard. Subsequently, although the Trustee at one time protested that the Bank ought not to be entitled to set off its secured claim against its bid for the realty, the Referee decided for the record that the Bank was entitled to set off its secured claim against its bid.

All of the Bankrupt's real estate was offered for sale, and was bought by the Bank. The Receiver could not sell what the Bankrupt did not own. By the order of August 30, 1965, as amended, the Trustee was directed to convey to the Bank all of the Bankrupt's right, title and interest to all of the Bankrupt's real estate. The Trustee is not being asked to warrant the title. Nor does this case involve bulk bids with several lien holders and a question as to which part of the total bid applied to each item sold, as in the cases on which the Trustee relies: In re Hetzel, D.C., M.D., Pa., 1938, 23 F.Supp. 530; In re Mannington Pottery Co., D.C., N.D., W.Va., 1952, 104 F.Supp. 506.

■ In this case the Trust Deed conveyed certain described realty together with all hereditaments and appurtenances. The supposedly excluded parcel is the vacated portion of Boone Street. The reversionary rights in Boone Street may be considered as covered by the conveyance of hereditaments and appurtenances. While the evidence before the Referee included a vacation ordinance entered after the sale, there were allegations that the original such ordinance predated the sale. In any case, the fee to the Boone Street area would have remained in the abutting lots subject to the public right to use the Street prior to vacation of that right.

The District Court order herein appealed which affirmed the order of the Referee is reversed, and this cause is remanded for delivery of the Trustee's Deed to the Bank in accordance with the corrected order of the Referee confirming the sale of the realty of the Bankrupt.

Reversed and remanded with instructions.