### In the Matter of Randy WEBER and Christian Weber, Debtors–Appellants.

No. 93–2766.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 20, 1994.

Decided May 13, 1994.

David A. Rosenthal, Rosenthal, Greives & O'Bryan, Lafayette, IN, for David A. Rosenthal, trustee.

James T. Hodson, Ball, Eggleston, Bumbleburg & McBride, Lafayette, IN (argued), for Farm Credit Services of Mid–America, ACA.

Robin W. Morlock, Asst. U.S. Atty., Dyer, IN, for U.S., acting through Farmers Home Admin., U.S. Dept. of Agriculture.

John O. Worth, Rushville, IN, William L. Schlosser, Schlosser & Schlosser, Indianapolis, IN (argued), for Randy Weber and Christian Weber.

Before CUDAHY and RIPPLE, Circuit Judges, and WILLIAMS, District Judge.*

CUDAHY, Circuit Judge.

Randy and Christian Weber run a large family farm in northern Indiana. The Webers filed for bankruptcy under Chapter 12 of the bankruptcy code on August 10, 1987. "The goal of a chapter 12 case is the confirmation of a debt adjustment plan." 5 *Collier on Bankruptcy* ¶ 1200.01 (15th ed. 1993).

After several objections by creditors and lengthy negotiations, the Webers' reorganization plan was finally confirmed by the bankruptcy court on September 23, 1988, more than a year after the Webers filed for bankruptcy. The bankruptcy court on that date entered an order confirming the plan.

■ Once a plan is confirmed, "all property of the estate will vest in the debtor except to the extent that the plan specifically provides otherwise." *Id.* A debtor who has completed making payments under the plan is entitled to a discharge from bankruptcy. 11 U.S.C. § 1228(a).

The dispute here involves a disagreement over the interpretation of the confirmed plan. Interpreting this plan presented the bankruptcy court with a perplexing task, perhaps because lengthy negotiations and numerous changes left the plan something of a patchwork.

For example, some of the plan's language suggests that the disposable income for *each* of the crop years from 1987 through 1989 is to go to the unsecured creditors on a pro rata basis. But other language implies that the plan itself has already accounted for the commitment of the disposable income from the 1987 crop year, leaving only the disposable income from the 1988 and 1989 crop years for the unsecured creditors. This apparent

contradiction proves critical, because, while the farm generated a profit of more than $120,000 in 1987, it lost money in both 1988 and 1989. The losses for those two years totaled over $300,000.

The unsecured creditors thus insist that they are entitled to their pro rata share of the more than $120,000 in profits that the farm generated in 1987, despite the fact that the farm lost money in the other two years. In support of this claim, they point to the language in the plan that says that income "shall be distributed for each crop year subject to review by Trustee to all unsecured creditors." Because the plan says *each* year, the creditors maintain that the profits from 1987 should have been distributed to them, rather than offset by the losses sustained in the later years. In addition, in support of their contention that the language calling for pro rata distributions following each crop year includes 1987, they point to other plan language that says that from "remaining funds available from the 1987–1989 crops, unsecured creditors shall receive pro-rata distribution of disposable income."

But the Webers too can cite to language in the confirmed plan (including some of the very same language on which their creditors rely) to suggest that the plan itself (which was not confirmed until September 1988) already accounted for the distribution of the income earned from the 1987 crop year. Article V of the plan (entitled "Means for Execution of the Plan") provides that:

> There is available approximately Four hundred thousand Dollars ($400,000.00) for the Spring of 1988, which is held by the Debtors–In–Possession, as well as the Trustee. After all disbursements for the year 1988, there should be remaining approximately thirty-five thousand dollars ($35,000.00) available to the Debtors–In–Possession for the Fall expenses. Certain input creditors in 1987 advanced supplies for the debtors['] crop. These advances are entitled to reimbursement ... Upon confirmation the sum of $37,500 shall be disbursed and $37,500 shall be disbursed by January 15, 1989. From remaining

* Hon. Ann Claire Williams of the Northern District of Illinois is sitting by designation.

funds available from the 1987–1989 crops, unsecured creditors shall receive pro-rata distribution of disposable income.

According to the Webers, then, the $120,000 in disposable income that was generated from the 1987 crop year was part of the $400,000 that was to be used for the "Spring of 1988." As such, that money was already spent, and thus not part of what the plan contemplated as the "remaining funds available from the 1987–1989 crops."

After the term of the plan expired, the Webers filed for a discharge. Their theory was that because their disposable income over the three year period was negative, they owed nothing to their unsecured creditors and were thus entitled to a discharge. But the bankruptcy court—the same court that approved the confirmed plan in the first instance—rejected this argument. "The plan does not contemplate payment of the net disposable income over a total of three years, thus permitting a loss in any one year to offset the profit from another year. Instead, the plan requires payments 'for each crop year.' Thus, each year stands alone and must be considered independently. As a result, the debtors are not permitted to offset their income from 1987 with the losses they sustained in 1988 and 1989." Decision (May 15, 1992) at 4. The bankruptcy court therefore denied the Webers' petition for a discharge. The district court affirmed this determination, finding that the plan called for a calculation and payment of disposable income "annually rather than cumulative." Mem. & Ord. (June 7, 1993) at 9.

But neither the bankruptcy court nor the district court addressed what appears to be the Webers' strongest argument, and the one they press most vigorously here: that even if disposable income is to be calculated annually (rather than cumulatively), the income from the 1987 crop year was already accounted for as part of the $400,000 whose disposition is provided for in the plan. The Webers fault the bankruptcy court as well as the district court for entirely ignoring this plan language.

But the Webers are themselves responsible for the bankruptcy court's failure to seize on this language, since their brief to that court made *only* the less compelling argument: that the losses from 1988 and 1989 offset the 1987 profits (despite the plan's referring to the disposable income from *each* of the three years). "This question as to disposable income certainly can be simplified in that the observation is whether or not, disposable income should be paid during the three (3) years under the Plan or whether a Court is to determine disposable income on a yearly basis." Webers' Post-hearing Brief at 3.

The bankruptcy court answered that question, and it did so adversely to the Webers. On appeal to the district court, the Webers for the first time (and there only in their reply brief) suggested that the 1987 profits were already accounted for in the plan. D.Ct.Reply Br. at 5–7. But the district court apparently refused to permit the Webers to sandbag the bankruptcy court by first advancing their strongest argument on appeal (and then belatedly). While it surely would have been preferable had the district court explained its reasoning, we read the court's refusal to address the argument at all as an implicit finding that the argument was waived.

That, in any event, is the correct result, since to find otherwise would permit a litigant simply to bypass the bankruptcy court. At oral argument in a case recently heard before another panel of this court, District Judge Will and Circuit Judge Rovner (formerly of the District Court) expressed their dismay with the practice of saving one's strongest argument for appeal:

> JUDGE WILL: They ask us to reverse a district court, on an argument that was never made to the district court. I'm a district judge. I think that's not fair to us trial judges, to come up here and say reverse us—
>
> JUDGE ROVNER: I used to feel that way.
>
> JUDGE WILL: You don't anymore? [Laughter.] I don't think it's fair to district judges to come to the Court of Appeals and say "reverse him, he's wrong, but we didn't tell him why."

*United States v. Eaglin,* No. 93–1561 (argued Nov. 9, 1993).

It is not only a concern for "fairness" to district judges, but also to encourage parties to resolve disputes at trial, rather than on appeal, that we require them to lay their cards on the table sooner. Thus, save for exceptional circumstances, we will not on appeal hear an argument not adequately presented to the district court. The district courts would otherwise serve merely as way stations en route to the court of appeals, and the filtering function of our hierarchical judiciary would be defeated. The same is surely true of arguments not made to bankruptcy judges. While there is perhaps some merit to the contention that 1987's disposable income was already accounted for in the Confirmed Plan, that argument was never presented to the bankruptcy court, and the Webers have therefore waived it.

This leaves only the question whether the 1987 profits should be offset by the losses sustained in 1988 and 1989. If they are, then at the end of the three-year period the Webers' disposable income is negative, and they thus owe nothing. As such, they would be entitled to a discharge.

The confirmed plan is susceptible to either interpretation, saying at one point that the disposable income "shall be distributed for each crop year," but at another indicating that from "remaining funds available from the 1987–1989 crops, unsecured creditors shall receive pro-rata distribution of disposable income."

The bankruptcy court (which issued the order confirming the plan) found that this language required the distribution of disposable income at the end of each year. The district court affirmed, but insisted that its review of the bankruptcy court's interpretation of the confirmed plan was *de novo.* Mem. & Ord. (June 7, 1993) at 5. For this proposition, it cited to an Eleventh Circuit case, *In re Club Associates,* 951 F.2d 1223, 1228–29 (11th Cir.1992), which held that a district court reviews a bankruptcy court's interpretation of a contract, like other conclusions of law, *de novo.* Since a confirmed plan is essentially a contract between a debtor and her creditors, the district court reasoned,

the bankruptcy court's interpretation was subject to *de novo* review.

But this suggestion contradicts our cases holding that a bankruptcy court's interpretation of a confirmed plan is subject only to deferential review. The confirmation of a reorganization plan is an order of the bankruptcy court. In reviewing a bankruptcy court's interpretation of a confirmed plan, then, the reviewing court should extend to that interpretation the same deference that is otherwise paid to a court's interpretation of its own order. *See generally Matter of Xonics, Inc.,* 813 F.2d 127, 130 (7th Cir.1987) ("The court's treatment of its own order— which treats the order as meaning exactly what it says—is entitled to respect."); *Matter of Chicago, Rock Island and Pacific R.R. Co.,* 865 F.2d 807, 810–11 (7th Cir.1988) ("We shall not reverse a district court's interpretation of its own order unless the record clearly shows an abuse of discretion. The district court is in the best position to interpret its own orders.") (citations and internal quotation marks omitted).

We have therefore previously observed that "[b]efore confirmation, a reorganization court must approve the terms of a proposed plan to ensure that they are 'fair and equitable' [citation omitted]. Thus when a reorganization court interprets a confirmed plan of reorganization, it interprets words on which it has already passed judgment. Under these circumstances, we believe that full deference to the court's decision is in order." *Matter of Chicago, Milwaukee, St. Paul & Pacific R.R. Co.,* 961 F.2d 1260, 1264 (7th Cir.1992).

In any event, *In re Club Associates,* the Eleventh Circuit case on which the district court relied for the proposition that the bankruptcy court's determinations were subject to *de novo* review, holds only that a bankruptcy court's conclusions of law—including its contractual interpretations—are reviewed *de novo.* But that case involved an ordinary contract, not a court's review of a reorganization plan that it had earlier confirmed. As such, our decision today does not create any tension with the Eleventh Circuit's decision, and in fact another decision of

that same court, observed that it was "reluctant to disturb a bankruptcy court's judgment interpreting its own earlier order.... We find no error in the present case in the bankruptcy court's interpretation of the confirmation order as embracing the initial plan." *In re Ranch House of Orange–Brevard, Inc.,* 773 F.2d 1166, 1168 (11th Cir. 1985).

The bankruptcy court here found that the confirmed plan called for the Webers annually to pay their disposable income to the unsecured creditors, and that under the plan the losses for the 1988 and 1989 crop years could not be used to offset the disposable income generated in 1987. Because that is a reasonable interpretation of the confirmed plan—a plan on which the bankruptcy court previously passed judgment—we will not now disturb that conclusion.

The district court's judgment, affirming the judgment of the bankruptcy court, is therefore AFFIRMED.