# In the
# United States Court of Appeals
## For the Seventh Circuit

Nos. 07-3863 & 07-3864

IN RE:

AIRADIGM COMMUNICATIONS, INC.,

*Debtor.*

AIRADIGM COMMUNICATIONS, INC. and
TELEPHONE AND DATA SYSTEMS, INC.,

*Appellants,*

*v.*

FEDERAL COMMUNICATIONS COMMISSION,

*Appellee.*

Appeals from the United States District Court
for the Western District of Wisconsin.
No. 07 C 307 S—**John C. Shabaz**, *Judge.*

ARGUED SEPTEMBER 16, 2008—DECIDED OCTOBER 29, 2008

Before CUDAHY, FLAUM, and ROVNER, *Circuit Judges.*

FLAUM, *Circuit Judge.* Debtor-appellant Airadigm Com-
munications, Inc. purchased fifteen personal communica-
tions services ("PCS") licenses in 1996 through FCC
auctions. It planned to pay for these licenses in install-

ments. Unable to meet its payment obligations, Airadigm filed for Chapter 11 bankruptcy in 1999. Its plan of reorganization, confirmed on November 15, 2000, was dependent upon financing by Telephone and Data Systems ("TDS"). The reorganization plan provided the FCC an allowed claim of $64.2 million for the fifteen licenses. The FCC took the position that the licenses were forfeited as a result of Airadigm's failure to pay in full, and Airadigm's Chapter 11 case proceeded as if the licenses were no longer an asset of the company. In 2003, however, the Supreme Court decided *FCC v. NextWave Personal Communications, Inc.*, 537 U.S. 293 (2003). That case held that the FCC could not cancel a license because the licensee had filed for bankruptcy prior to paying for the license. The FCC then conceded that it had incorrectly terminated Airadigm's licenses, and it reinstated them.

Airadigm filed a second Chapter 11 petition in May 2006. TDS again would provide financing. On September 14, 2006, the FCC filed a claim for each of the licenses, seeking the principal amounts owed on the licenses (about $64.2 million) and accrued interest on the claims through the 2006 petition date (about $42.4 million). Airadigm and TDS objected to the FCC's claims for interest, arguing that under the 2000 plan all interest stopped accruing on the 1999 petition date.

The bankruptcy court denied the FCC interest for the period from the commencement of the bankruptcy case to the November 15, 2000 confirmation date, but it found that the 2000 plan implicitly entitled the FCC to post-confirmation interest. The district court affirmed the

bankruptcy court in part to allow post-confirmation interest and reversed the bankruptcy court in part to also allow a portion of the additional interest that the FCC sought. Airadigm and TDS appeal. For the reasons explained below, we affirm the district court's ruling awarding post-confirmation interest for the period between confirmation of Airadigm's 2000 plan of reorganization and commencement of new bankruptcy proceedings in 2006; and we affirm the district court's award of post-petition interest for the interim period between commencement of the 1999 bankruptcy proceeding and confirmation of the 2000 plan.

## I. Background

The FCC awards spectrum licenses—which can be used for a variety of mobile and fixed radio services—for specific time periods. The Communications Act of 1934, as amended, authorizes the FCC to allocate spectrum licenses through a system of competitive bidding, based on the premise that the highest qualified bidder will be most likely to build out the licenses and put them to public use. 47 U.S.C. § 309(j)(1). This Act further requires the FCC to design auctions that "ensure that small businesses, rural telephone companies, and businesses owned by members of minority groups and women are given the opportunity to participate in the provision of spectrum-based services." 47 U.S.C. § 309(j)(3)(B), (j)(4)(D). The FCC earmarked certain blocks of spectrum—blocks C and F—for such entities who, unable to afford a lump sum payment, could pay for their licenses in installments.

47 C.F.R. § 24.709 (2007). To ensure payment, the FCC made payment-in-full a condition precedent to obtaining a license, 47 C.F.R. § 1.2110(g)(4)(iv), and it executed a promissory note and security agreement to secure its interest in each license. *Id.* § 1.2110(g)(3). If the successful bidder fell into default, "its license [would] automatically cancel, and it [would] be subject to debt collection procedures." 47 C.F.R. § 1.2110(g)(4)(iv).

In a 1996 FCC auction, Airadigm was the highest bidder for fifteen licenses designated for small businesses. Thirteen of these licenses were "C-block" and two were "F-block" segments. The licenses authorized Airadigm to use portions of the electromagnetic spectrum to provide wireless telecommunications services in parts of Wisconsin, Iowa, and Michigan. Airadigm agreed to pay for these licenses in quarterly installments, plus interest, over a ten-year period. Airadigm paid ten percent of the purchase price, signed fifteen promissory notes recognizing its debt to the FCC, and executed fifteen security agreements. The licenses themselves stated that they were conditioned on the "full and timely payment of all monies due pursuant to [FCC regulations] and the terms of the Commission's installment plan." The licenses stated that failure to comply with this condition would result in automatic cancellation of the licenses. The FCC sought to perfect its interest in the licenses by, among other things, filing UCC financing statements with the office of the Wisconsin Secretary of State.

Airadigm soon met financial problems. It defaulted on its obligations to the FCC and filed a voluntary petition

for Chapter 11 relief on July 28, 1999. The FCC allowed Airadigm to continue using its portion of the spectrum but cancelled Airadigm's licenses and filed a proof of claim in bankruptcy court for about $64.2 million, which represented the aggregate unpaid principal balance due under the fifteen notes. The FCC stated that the licenses had automatically cancelled by operation of law and that, as its collateral had been extinguished, its claims against Airadigm were unsecured. Hedging, the FCC recognized in its proof of claim that if it did not have the authority to cancel the licenses, its debt was instead secured by the licenses themselves. Airadigm filed a petition with the FCC seeking either reinstatement of the licenses or a waiver of their cancellation.

In October 2000, Airadigm and several other interested parties filed a plan of reorganization. The FCC objected to confirmation of the plan, but it limited its objection to the plan's treatment of the FCC as the holder of an unsecured claim. On November 1, 2000, a confirmation hearing was held on the debtor's plan. On November 15, 2000, the bankruptcy court entered an order confirming the 2000 plan. The FCC did not appeal.

The reorganization proceeded under the assumption that the FCC had properly cancelled the licenses. The plan provided that the FCC had an allowed claim of $64.2 million and laid out several contingencies should the FCC reinstate the licenses. TDS would provide the financing under these contingency scenarios. Should the FCC reinstate the licenses by June 2001, TDS would pay the FCC's claim in full. If the FCC did not reinstate the

licenses by June 2001 but did so by June 2002, TDS had the option of paying off the claim but was not obligated to do so. But if the FCC never reinstated the licenses or "fail[ed] to act . . . in a timely manner," the plan provided that TDS would obtain all of Airadigm's assets except the licenses. The plan was otherwise silent as to the FCC's exact interests in the licenses and what would happen if the FCC reinstated them after June 2002. And the plan did not expressly preserve the FCC's security interest in the licenses, instead stating that the plan "shall not enjoin or in any way purport to limit, restrict, affect or interfere with action initiated by the FCC in the full exercise of its regulatory rights, powers and duties with respect to the Licenses."

The FCC did not act on the reinstatement petition by June 2002. On January 27, 2003, the Supreme Court issued its decision in *F.C.C. v. NextWave Personal Communications, Inc.*, 537 U.S. 293 (2003). In a case involving a factual scenario very similar to this one, the Court held that the FCC could not cancel a debtor's PCS licenses just because it had filed for bankruptcy. The Court held that automatic cancellation violated § 525 of the Bankruptcy Code, which provides that a government unit may not "deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant" to a debtor in bankruptcy "solely because such debtor . . . has not paid a debt that is dischargeable in the case under this [Bankruptcy] title or that was discharged under the Bankruptcy Act." 11 U.S.C. § 525(a). The Court reasoned that even if timely installment payments further the FCC's regulatory purposes, the obligation to make

such payments is still a debt within the meaning of § 525, and that the failure to make payments on such debt therefore cannot be the sole basis for cancelling the FCC licenses. *NextWave*, 537 U.S. at 302-05. The FCC conceded a few months later that it had been wrong to terminate Airadigm's licenses, and it reinstated them as though they had never been cancelled.

After the FCC reinstated Airadigm's licenses, Oneida Enterprise Development Authority (OEDA), another Airadigm creditor, filed an objection to the FCC's claim. OEDA argued that the FCC's delay in reinstating the licenses prejudiced them and the FCC's claim should be disallowed for inequitable conduct, deemed waived, or subordinated to the claims of other creditors. The FCC responded that its conduct was appropriate and that there was no legal basis to disallow or subordinate its claim. Agreeing with the FCC, the bankruptcy court signed an order granting the motion to dismiss and ordering "that the FCC's claim is allowed in the amount of $64,219,442.55." The allowance order did not provide for any interest on the FCC claim.

On May 8, 2006, Airadigm filed a second Chapter 11 bankruptcy petition. It asserted that a new bankruptcy proceeding was necessary because in the period between cancellation of the licenses and their post-*NextWave* restoration, the licenses had decreased in value and could no longer cover Airadigm's debts. On June 6, 2006, the parties entered a stipulation agreeing, among other things, that "The FCC's allowed claim in the 1999 bankruptcy case shall be allowed in the 2006 bankruptcy case."

In exchange for this agreement, the FCC agreed not
to object to the closing of the 1999 case and the opening
of the 2006 case. The stipulation further provided that "all
other rights of the parties hereto (including without
limitation, the right of the FCC and TDS to seek inclusion
and allowance of interest on their allowed claims) . . . are
expressly reserved."

The FCC then renewed its claim, asserting that the
claim was secured and demanding unpaid principal in
the amount of $64.2 million; accrued interest on the
claims running through the commencement of the 2006
case in the amount of $42.4 million; and post-2006 petition
interest. Airadigm and its financier TDS objected to the
interest claims. They argued that the only claims that
the FCC could pursue were those arising from the 2000
plan, that the FCC had waived any claim to interest by
not specifically including interest on the 1999 proof of
claim form, and that the interest claims were now barred
because the order allowing the FCC's claim over the
Oneida objection only allowed the debt principal and
made no provision for interest.

On February 23, 2007, the bankruptcy court held a
hearing on the FCC's 2006 claims. At that hearing, the
bankruptcy court denied the FCC pre-1999 petition
interest and denied the FCC interest for the period between
commencement of the 1999 case and confirmation of the
2000 reorganization plan. It reasoned that these claims
were excluded by the order on the Oneida objection
setting the amount of the FCC's allowed claim at
$64.2 million—an amount that included only principal,

without interest. The bankruptcy court did add interest in the amount of $24,625,118.40 for the period between confirmation of the 2000 plan (which occurred on November 15, 2000) and commencement of the second bankruptcy case on May 8, 2006. The bankruptcy court found that the 2000 plan implicitly entitled the FCC to this post-confirmation interest at the contract rate. It reasoned that the FCC was a secured creditor with respect to the licenses restored to Airadigm after *NextWave*; that secured creditors must, under § 1129(b) of the Bankruptcy Code, receive interest on their secured claim if payments are deferred; and that the award of post-confirmation interest on the allowed claim, at the market rate specified in the contract underlying the FCC's claims, was implicit in the court's earlier confirmation order. The bankruptcy court also held that the FCC was entitled to interest running from commencement of the 2006 bankruptcy proceeding on claims pertaining to two of Airadigm's licenses.

Both parties appealed to the district court. The district court affirmed the decision on prepetition interest accruing before commencement of the 1999 case. The court reasoned that the bankruptcy court order denying the OEDA objection to the FCC's claim and setting the amount of the allowed claim did not provide for prepetition interest. The district court affirmed the bankruptcy court's award of implicit interest for the period from November 15, 2000 to May 8, 2006. The court reasoned that the bankruptcy court's construction of its own prior order confirming Airadigm's plan of reorganization was entitled to deference and was, in any event, "the

only reasonable interpretation of the plan." Additionally, the district court reversed the bankruptcy court to hold that the FCC was entitled to $6.6 million more in interest for the time period after commencement of the 1999 case through confirmation of the 2000 plan (from July 28, 1999 through November 15, 2000). The district court granted this interest based on § 506(b) of the Bankruptcy Code, which requires interest when a claim is oversecured. The court found that the value of the licenses securing the claim at the time of the 1999 petition was greater than the amount of the allowed claim.

Airadigm and TDS appeal the district court order to the extent that it awarded implicit interest for the period from November 15, 2000 to May 8, 2006 and § 506(b) interest for the period from July 28, 1999 to November 15, 2000. The FCC no longer challenges the denial of pre-1999 petition interest, and Airadigm and TDS no longer challenge the award of interest for the period following commencement of the 2006 bankruptcy case.

## II.  Discussion

### A.  Standard of Review

Legal conclusions are reviewed de novo. Findings of fact may be reversed only if clearly erroneous. *In re Outboard Marine Corp.*, 386 F.3d 824, 827 (7th Cir. 2004). A bankruptcy court's interpretation of a plan it confirmed is subject to full deference as an interpretation of its own order and may be overturned only if the record shows an abuse of discretion in the interpretation. *In re Weber*, 25 F.3d 413, 416 (7th Cir. 1994).

**B. November 15, 2000 to May 8, 2006**

The FCC objected to confirmation of the 2000 plan. To confirm a plan of reorganization without the consent of an impaired class (to "cram down" the plan), two conditions must be met. 11 U.S.C. § 1129(a); *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 North Lasalle Street P'ship*, 526 U.S. 434, 441 (1999). First, each requirement of Bankruptcy Code § 1129(a), other than § (a)(8), must be met. *203 North Lasalle*, 526 U.S. at 441. Second, to override the objection of the non-consenting class, the plan must "not discriminate unfairly, and [must be] fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." § 1129(b)(1). To be "fair and equitable" as to an objecting secured creditor, it is a statutory "requirement" that the plan's provisions satisfy one of the following scenarios: (i) the creditor retains its liens and receives the present value of its allowed secured claims; (ii) the collateral securing the debt is sold with the liens attaching to the funds from the sale; or (iii) the creditor is given the "indubitable equivalent" of its claim. 11 U.S.C. §§ 1129(b)(1), (2)(A).

To satisfy the first scenario, which is the scenario implicated in this case, an objecting secured creditor must be given "deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property." 11 U.S.C. § 1129(b)(2)(A)(i)(II). When payment is deferred, "a creditor receives the 'present value' of its claim only if the

total amount of the deferred payments includes the amount of the underlying claim plus an appropriate amount of interest to compensate the creditor for the decreased value of the claim caused by the delayed payments." *Rake v. Wade*, 508 U.S. 464, 472 n.8 (1993). Section 1129(b)(2)(A)(i)(II) thus requires interest if the claim is to be paid over time. *United Sav. Ass'n v. Timbers of Inwood Forest, Assocs., Ltd.*, 484 U.S. 365, 377 (1988).

In this case, there was initially great uncertainty as to whether the FCC should be treated as a secured or unsecured creditor. At the time of plan confirmation, the parties believed that the FCC was an unsecured creditor. The bankruptcy court confirmed a plan that did not explicitly provide for interest under § 1129(b)(2)(A), which allows for interest for secured creditors only. Then the Supreme Court decided *NextWave*, which made clear that the FCC was in fact a secured creditor. The FCC subsequently reinstated the licenses.

As a secured creditor, the FCC brought this litigation, retroactively seeking interest under § 1129(b)(2)(A). The bankruptcy court awarded this interest to the FCC. The court noted that, as a result of pending disputes over whether the licenses should be restored to Airadigm, the FCC's status as a secured creditor was not certain at the time of plan confirmation. It reasoned, however, that *NextWave*, and the subsequent reinstatement of licenses, made clear that the FCC was in fact a secured creditor. Since the FCC was a secured creditor, the bankruptcy court found that interest under § 1129(b)(2)(A)(i) was "implicit" in the 2000 plan, and it awarded this interest to the FCC. The bankruptcy court explained:

It was implicit in that confirmation over the objection of what we subsequently learned was a secured creditor that they were entitled to that much. So on their allowed secured claim, the payment of which was deferred, they're entitled to receive something to bring that deferred payment to present value which we call interest.

There is an issue in this case whether, in allowing interest under § 1129(b)(2)(A), the bankruptcy court merely *interpreted* the reorganization plan that it had devised, or whether it actually *modified* the plan. This question is crucial, as a bankruptcy court interpretation is entitled to our full deference and can only be overturned for abuse of discretion, *Weber*, 25 F.3d at 416; *In re Chicago, Milwaukee, St. Paul & Pacific R.R. Co.*, 961 F.2d 1260, 1264 (7th Cir. 1992), whereas a plan cannot be modified for any reason after substantial consummation, 11 U.S.C. § 1127(b); *In re CF & I Fabricators of Utah, Inc.*, 150 F.3d 1233, 1238 (10th Cir. 1998); *Goodman v. Phillip R. Curtis Enters., Inc.*, 809 F.2d 228 (4th Cir. 1987), and there is authority for the proposition that a sua sponte modification by the bankruptcy court is not permitted at any time. *See, e.g., Beal Bank, S.S.B. v. Jack's Marine, Inc.*, 201 B.R. 376, 380 (E.D. Pa. 1996) ("Though a bankruptcy court exercises its equitable powers at its own discretion, it cannot override specific provisions of the bankruptcy code. Nor can a court rewrite a confirmed plan on the grounds of perceived equities."). Airadigm and TDS dispute that the bankruptcy court's ruling is subject to the deference granted "an interpretation" of a bankruptcy court order. They claim that the bankruptcy court's ruling did not "interpret"

the plan but rather modified it and "rewrote history." The FCC argues to the contrary.

After reviewing the record of the bankruptcy court, it is clear to us that the bankruptcy court interpreted the 2000 plan when it found that the interest was implied. The 2000 plan left several specifics of plan implementation open for subsequent determination. When the plan was confirmed, the legal status of Airadigm's licenses and the FCC's automatic cancellation policy was still pending. In allowing interest under § 1129(b)(2)(A), the bankruptcy court revisited its own plan to interpret the plan's provisions in light of the changing status of the licenses. The bankruptcy court reviewed the 2000 plan and reviewed the contingencies related to whether the FCC was to be treated as a secured or unsecured creditor. It saw that the 2000 plan assumed that the FCC would not be paid immediately on its allowed claim but would receive deferred payments. It saw nothing in the 2000 plan that specifically precluded interest under § 1129(b)(2)(A). And it read the plan to imply that a § 1129(b) cram-down would be required, and interest would be available, if the FCC was ultimately found to be a secured creditor. The bankruptcy court did not rewrite the plan so that it would include a provision that was originally precluded. Rather, the bankruptcy court's grant of interest under § 1129(b)(2)(A) in this case was the result of a mere interpretation of its own plan.

The Sixth Circuit reached a similar conclusion in *In re Terex Corp.*, 984 F.2d 170 (6th Cir. 1993). In *Terex*, the confirmed plan of reorganization provided that the

debtor would pay insurance premiums upon a distribution date. The debtor failed to make the payments, and the creditor-insurer filed a claim for the premiums plus interest. The bankruptcy court held that the creditor was entitled to interest from the effective date of the plan. *Terex*, 984 F.2d at 171-72. On appeal, the debtor asserted that interest was improperly awarded. *Id.* In affirming, the Sixth Circuit rejected the debtor's arguments that the bankruptcy court's order allowing interest contradicted the terms of the plan and constituted an impermissible modification. The Sixth Circuit found that the plan did not explicitly preclude a retrospective award of interest, and that the bankruptcy court's decision was plausibly an interpretation of the plan it had previously confirmed pursuant to its equitable powers. Because it was an interpretation, the bankruptcy court decision was entitled to full deference on appeal. *Id.* at 172-73. The *Terex* case supports our reasoning that the bankruptcy court was engaged in an interpretation in the instant case.

Like in *Terex*, the bankruptcy court's finding here is entitled to our full deference because it was an "interpretation" of its own reorganization plan. We have observed that "[b]efore confirmation, a reorganization court must approve the terms of a proposed plan to ensure that they are 'fair and equitable.' Thus when a reorganization court interprets a confirmed plan of reorganization, it interprets words on which it has already passed judgment. Under these circumstances, we believe that full deference to the court's decision is in order.*" Chicago, Milwaukee, St. Paul & Pacific R.R.*, 961 F.2d at 1264; *see also Weber*, 25 F.3d at 416 (stating that because a bankruptcy

court is uniquely situated to interpret its own order, when it does so, that interpretation is subject to a highly deferential standard of review). Under a full deference standard, in order to overturn the interpretation, we would need to determine there was an abuse of discretion by the bankruptcy judge. *Weber*, 25 F.3d at 416. To the contrary, we find it logical that the bankruptcy court determined that the payment of interest was implied in its order, as the bankruptcy court is uniquely situated to interpret its own plan, and in this case it interpreted its own plan to comply with a statutory scheme. There was no abuse of discretion.

Airadigm and TDS also argue that the "overriding error" committed by the district court and the bankruptcy court in granting implicit interest for the period between confirmation of the 2000 plan and commencement of the 2006 case was that "they disregarded the doctrine of finality." They claim that if the FCC believed it was entitled to interest under § 1129(b), it should have litigated that issue before confirmation of the plan or by direct appeal, and that now the doctrine of res judicata precludes the FCC from litigating the issue. This argument fails under applicable Seventh Circuit precedent. In *In re Escobedo*, 28 F.3d 34 (7th Cir. 1994), we held that a confirmed reorganization plan does not have res judicata effect so as to bar a party from making an effort to bring the plan into conformity with *mandatory* statutory provisions. *Escobedo*, 28 F.3d at 35. As discussed, § 1129(b) employs the word "requirement," which signals that it is a mandatory provision. It requires that an objecting, secured creditor is paid interest if payment of the principal is

deferred. 11 U.S.C. § 1129(b)(2)(A)(i)(II). The FCC's failure to assert its right to interest under § 1129(b)(2)(A) before plan confirmation or on direct appeal does not bar the FCC from asserting the right in this litigation.

In sum, the FCC validly asserted its right to interest under § 1129(b)(2)(A) in this litigation, and the bankruptcy court interpreted its own plan to provide for such interest. We defer to the bankruptcy court decision, and we affirm that the FCC is entitled to interest for the time period between confirmation of the 2000 plan and commencement of the 2006 case.

### C. July 28, 1999 to November 15, 2000

An oversecured creditor's entitlement to interest for the period after the commencement of a case and before confirmation of a plan is governed by § 506(b) of the Bankruptcy Code, which states in pertinent part: "To the extent that an allowed secured claim is secured by property the value of which . . . is greater than the amount of such claim, there shall be allowed to holder of such claim, interest on such claim . . . ." 11 U.S.C. § 506(b). The Code thus provides that the holder of an oversecured claim is allowed post-petition interest to the extent of the value of the collateral. Such interest accrues from the petition date until the confirmation or effective date of the plan, and the total amount of accrued, § 506(b) interest is deemed an additional part of the secured creditor's allowed claim. *Rake*, 508 U.S. at 471-72.

It is clear that the FCC had an oversecured claim for the relevant time period, which lasted from July 28, 1999

to November 15, 2000. The bankruptcy court did not award § 506(b) interest to the FCC for this time period. While it did not separately address this claim, it seems to have denied this claim because it found the FCC's claim for post-1999 petition § 506(b) interest—which was made well after its order on the OEDA objection that set the FCC's allowed claim at an amount that did not account for interest—untimely. The district court reversed. Our review of this issue, which is an issue of law, is de novo.

Airadigm and TDS argue on appeal that, by the time the FCC first requested § 506(b) interest, the FCC had already waived this claim. They argue that there is nothing in the language of § 506(b) that allows a court to award postpetition interest when the FCC did not request § 506(b) interest prior to reorganization plan confirmation; did not object to an allowance order that did not award interest; and did not otherwise raise the issue prior to the commencement of the 2006 case.

In *In re Chappell*, 984 F.2d 775 (7th Cir. 1993), a Chapter 13 plan provided for the payment of an oversecured debt in full, but the creditor neglected to request postpetition interest under § 506(b). A year after confirmation of the plan, the secured creditor contacted the Chapter 13 trustee raising questions regarding whether interest had been included in the debtor's payment plans. However, the secured creditor abandoned this effort before resolving it and without bringing it to the bankruptcy court's attention. The case was closed four years later. *Chappell*, 984 F.2d at 778-82. Thereafter, a successor to the secured creditor sought to collect interest on one of the

oversecured claims. We recognized that both the bank-
ruptcy court and the district court found the creditor's
belated request for interest was untimely: "Despite the
fact that section 506(b) may have entitled Homebanc [the
successor to the secured creditor] to interest, the courts
reasoned that Homebanc lost any entitlement when it
failed to raise this issue until after the Chapter 13 plan
had been completed, the Chappells discharged, and
the case closed." *Id.* at 782. We affirmed. We stated:
"Several opportunities were available during the life of
the plan to assert the right to section 506(b) interest, but
none was taken. No objection was filed, and the plan
was confirmed. . . . As a general rule, the failure to raise
an objection at the confirmation hearing or to appeal
from the order of confirmation should preclude . . . attack
on the plan or any provision therein as illegal in a sub-
sequent proceeding." *Id.* (internal citations omitted). We
continued: "It is important to note that Loves Park,
Homebanc's predecessor, learned that it was not
receiving interest on the second mortgage while the
plan was still in effect. Yet, no effort was made to bring
this fact to the attention of the bankruptcy court. Instead,
Homebanc sought relief only after the Chappells were
discharged and the case was closed." *Id.* at 783.

In the instant case, the FCC did not assert its right to
§ 506(b) interest at any point before the bankruptcy court
"closed" the 1999 case. But, the 1999 case was "substan-
tially consummated" and "closed" only because the
parties reached an agreement to preserve the 1999 claims
as part of the 2006 case. Before agreeing to the close of the
1999 case, the FCC and Airadigm explicitly stipulated

that "[t]he FCC's allowed claim in the 1999 bankruptcy case shall be allowed in the 2006 bankruptcy case," and that "all other rights of the parties hereto (including without limitation, the right of the FCC and TDS to seek inclusion and allowance of interest on their allowed claims) . . . are expressly reserved." In exchange for this agreement, the FCC agreed not to object to the closing of the 1999 case and the opening of the 2006 case.

The stipulation distinguishes the instant case from *Chappell*. We based our decision in *Chappell* largely on the fact that the bankruptcy case was closed and the creditor's principal was paid in full. Here the 1999 claims were not "closed," and Airadigm was not discharged from bankruptcy when the FCC requested the interest. *Chappell* does not stand for the proposition that failure to assert the right to § 506(b) interest before plan confirmation waives that right, and it would be illogical for us to hold here that the FCC needed to request § 506(b) interest before plan confirmation to avoid waiver. Section 506(b) interest is only available to oversecured creditors, and while the FCC could have known that the licenses were worth more than the amount of its claim at the time of confirmation, it was unclear whether the FCC was a secured or unsecured creditor at that time. While it would have been prudent for the FCC to request § 506(b) interest sooner after the licenses were reinstated, the right to request such interest was not waived. To the contrary, the 1999 claims were expressly preserved as a result of the FCC's diligence in protecting its rights while waiting for the debtor to pay its debt.

Thus, § 506(b) entitles the FCC to interest accruing from July 28, 1999 to November 15, 2000. We affirm the district court's award of postpetition interest for the interim period between commencement of the 1999 bankruptcy proceeding and confirmation of the 2000 reorganization plan.

### III.  Conclusion

For the foregoing reasons, we AFFIRM the district court's ruling awarding post-confirmation interest for the period between confirmation of Airadigm's 2000 plan of reorganization and commencement of new bankruptcy proceedings in 2006; and we AFFIRM the district court's award of post-petition interest for the interim period between commencement of the 1999 bankruptcy proceeding and confirmation of the 2000 plan.